# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| IN RE THE ANTIOCH COMPANY, ET AL., | : | **Case Nos. 08-35741 through 08-35747** |
| | : | **(Jointly Administered)** |
| | : | |
| **Debtors** | : | |
| _____ | : | _____ |
| | : | |
| **THE ANTIOCH COMPANY** | : | **Judge Guy R. Humphrey** |
| **LITIGATION TRUST, W. TIMOTHY** | : | |
| **MILLER, TRUSTEE** | : | **Adversary Proceeding No. _____** |
| **425 Walnut Street, Suite 1800** | : | |
| **Cincinnati, Ohio 45202-3957** | : | |
| | : | **COMPLAINT AND JURY DEMAND** |
| **Plaintiff** | : | |
| vs. | : | |
| | : | |
| **LEE MORGAN** | : | |
| **140 Glen Street** | : | |
| **Yellow Springs, Ohio 45387** | : | |
| | : | |
| **ASHA MORGAN MORAN** | : | |
| **1922 17th Street South** | : | |
| **Saint Cloud, Minnesota 56301** | : | |
| | : | |
| **CHANDRA ATTIKEN** | : | |
| **18137 Murray Road** | : | |
| **Mt. Vernon, Ohio 43050** | : | |
| | : | |
| **STEVE BEVELHYMER** | : | |
| **4102 Amy Brook Circle** | : | |
| **Bellbrook, Ohio 45305** | : | |
| | : | |
| **NANCY BLAIR** | : | |
| **150-6th Avenue S.W.** | : | |
| **Calgary, Alberta T2P 3Y7** | : | |
| **Canada** | : | |
| | : | |
| **BEN CARLSON** | : | |
| **5007 Lausanne Drive** | : | |
| **Centerville, Ohio 45458-3001** | : | |
| | : | |
| | : | |

**CANDLEWOOD PARTNERS, LLC**      :
**10 ½ East Washington Street**      :
**Chagrin Falls, Ohio 44022**      :
                                    :
   **Also serve: CT Corporation**      :
           **Registered Agent**      :
           **1300 East Ninth Street**      :
           **Cleveland, Ohio 44114**      :
                                    :
**CRG PARTNERS GROUP, LLC**      :
**2 Atlantic Avenue**      :
**Boston, Massachusetts 02110**      :
                                    :
   **Also serve: Ted O'Reilly**      :
           **Registered Agent**      :
           **2 Atlantic Avenue**      :
           **Boston, Massachusetts 02110**      :
                                    :
**MICHAEL EPSTEIN**      :
**2 Atlantic Avenue**      :
**Boston, Massachusetts 02110**      :
                                    :
**EVOLVE BANK AND TRUST**      :
**11311 Cornell Park Drive #400**      :
**Cincinnati, Ohio 45242**      :
                                    :
   **Also serve: CT Corporation**      :
           **Registered Agent**      :
           **1300 East Ninth Street**      :
           **Cleveland, Ohio 44114**      :
                                    :
**KAREN FELIX**      :
**308 Blue Heron Court**      :
**Middletown, Delaware 19709**      :
                                    :
**GREATBANC TRUST COMPANY**      :
**77 West Wacker Drive, 5th Floor**      :
**Chicago, Illinois 60601**      ;
                                    :
   **Also serve: BFKPN Corporate Services**      ;
           **Registered Agent**      :
           **200 West Madison Street**      :
           **Suite 3900**      :
           **Chicago, Illinois 60606**      :
                                    :
                                    :

**BARRY HOSKINS**                               :
**31732 222nd Court Southeast**                 :
**Black Diamond, Washington 98010**             :
                                                :
**HOULIHAN, LOKEY, HOWARD &**                   :
**ZUKIN, INC.**                                 :
**191 North Wacker Drive, 30th Floor**          :
**Chicago, Illinois 60606**                     :
                                                :
    **Also serve: Christopher M. Crain**   :
       **1930 Century Park West**         :
       **Los Angeles, California 90067**  :
                                                :
**KIMBERLY LIPSON-WILSON**                      :
**200 Old Carriage Drive**                      :
**Englewood, Ohio 45322**                       :
                                                :
**WAYNE ALAN LUCE**                             :
**7 South Point Drive**                         :
**Asheville, North Carolina 28804**             :
                                                :
**JEANINE MCLAUGHLIN**                          :
**7410 Annapolis Lane**                         :
**Pompano Beach, Florida 33067**                :
                                                :
**MARTY MORAN**                                 :
**1922 17th Street South**                      :
**Saint Cloud, Minnesota 56301**                :
                                                :
**LEE MORGAN GDOT TRUST #1**                    :
**c/o Lee Morgan**                              :
**140 Glen Street**                             :
**Yellow Springs, Ohio 45387**                  :
                                                :
**LEE MORGAN GDOT TRUST #2**                    :
**c/o Lee Morgan**                              :
**140 Glen Street**                             :
**Yellow Springs, Ohio 45387**                  :
                                                :
**LEE MORGAN GDOT TRUST #3**                    :
**c/o Lee Morgan**                              :
**140 Glen Street**                             :
**Yellow Springs, Ohio 45387**                  :
                                                :
                                                :
                                                :

**LEE MORGAN POUROVER TRUST #1**                  :
c/o Lee Morgan                                    :
**140 Glen Street**                               :
**Yellow Springs, Ohio 45387**                    :
                                                  :
**LEE MORGAN POUROVER TRUST #2**                  :
c/o Lee Morgan                                    :
**140 Glen Street**                               :
**Yellow Springs, Ohio 45387**                    :
                                                  :
**G. ROBERT MORRIS**                              :
**6075 Poplar Avenue, Suite 500**                 :
**Memphis, Tennessee 38119**                      :
                                                  :
**JAMES NORTHRUP**                                :
**10 Eskerview Road**                             :
**Vermontville, New York 12989**                  :
                                                  :
**PAUL RAVARIS**                                  :
**2 Atlantic Avenue**                             :
**Boston, Massachusetts 02110**                   :
                                                  :
**RELIANCE TRUST COMPANY**                        :
**1100 Abernathy Road**                           :
**500 Northpark, Suite 400**                      :
**Atlanta, Georgia 30328**                        :
                                                  :
      **Also serve: Robert D. Stallings,**        :
               **Registered Agent**               :
               **1100 Abernathy Road**            :
               **500 Northpark, Suite 400**       :
               **Atlanta, Georgia 30328**         :
                                                  :
**DENIS SANAN**                                   :
**1282 Pepper Lane**                              :
**Santa Barbara, California 93108**               :
                                                  :
**MALTE VON MATTHIESSEN**                         :
**2000 Wildrose Lane**                            :
**Roaring Judy Ranch**                            :
**Almont, Colorado 81210**                        :
                                                  :
                                                  :
                                                  :
                                                  :
                                                  :

11585190.1

**FREDERICK WALKER**                          :
**1454 Redsail Circle**                          :
**Westlake Village, California 91361**     :
                                                          :
              **Defendants.**                 :

Plaintiff, The Antioch Company Litigation Trust (the "Trust"), by and through W.

Timothy Miller, Trustee (the "Trustee"), brings this complaint (the "Complaint") against

defendants Lee Morgan, Asha Morgan Moran, Chandra Attiken, Steve Bevelhymer, Nancy Blair,

Ben Carlson, Candlewood Partners, LLC, CRG Partners Group, LLC, Michael Epstein, Evolve

Bank & Trust, Karen Felix, GreatBanc Trust Company, Barry Hoskins, Houlihan, Lokey,

Howard & Zukin, Inc., Kimberly Lipson-Wilson, Wayne Alan Luce, Jeanine McLaughlin, Marty

Moran, Lee Morgan GDOT Trust #1, Lee Morgan GDOT Trust #2, Lee Morgan GDOT Trust

#3, Lee Morgan Pourover Trust #1, Lee Morgan Pourover Trust #2, G. Robert Morris, James

Northrup, Paul Ravaris, Reliance Trust Company, Denis Sanan, Malte von Matthiessen, and

Frederick Walker (collectively, the "Defendants") and states as follows:

## NATURE OF THE CASE

1.        This adversary proceeding involves claims against 30 Defendants.  The

Defendants are former directors and officers, trustees, and professionals of the Debtors.  The

central premise of this Complaint is simple: the Defendants placed their own interests ahead of

the interests of the Company, its employees, and its creditors.  As a result, the Company, once a

highly profitable enterprise, filed for bankruptcy protection.  Although the Company reorganized

(with some Defendants still holding key management positions and significant equity interests),

the beneficiaries of the Trust received nothing—current and former employees lost their

retirement savings, and disfavored creditors received no distributions.  The Defendants caused

and profited from the decline of the Company.  The Trustee seeks an award of monetary

damages for the Defendants' egregious conduct and an order subordinating the Defendants' interests in the Trust.

## JURISDICTION

2.      The Court has jurisdiction pursuant to 11 U.S.C. §§ 105, 541, 544, 547, 548, 549, 550 and 551, Bankruptcy Rule 7001, 28 U.S.C. § 1334 and pendent jurisdiction with respect to state law causes of action.  This adversary proceeding arises under Title 11 of the United States Code and arises in or is related to Chapter 11 Bankruptcy Case Nos. 08-35741-08-34747 (the "Bankruptcy Cases") pending before this Court.

3.      This matter is a core proceeding pursuant to 11 U.S.C. §§ 157(b)(2)(A), (E), (F), (H) and (O).

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

5.      The Antioch Company was headquartered in Yellow Springs, Ohio.  The Court has personal jurisdiction over the Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure and pursuant to the Defendants' minimum contacts with the United States and this district and division.

## THE PARTIES

6.      The Antioch Company and certain of its subsidiaries (the "Debtors," "Antioch," or the "Company") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on November 13, 2008 (the "Petition Date") in this Court. On January 27, 2009, the Court entered an order (Doc. No. 319) (the "Order") confirming the Second Amended Joint Prepackaged Plan of Reorganization proposed by the Debtors (Doc. No. 336) (the "Plan").

### *The Plaintiff*

7.      The Trust is a liquidating trust established pursuant to the Plan and the Order.

Pursuant to the Plan and the Order, the Debtors transferred certain of their assets, including

certain causes of action (the "Transferred Claims"), to the Trust as of February 6, 2009 (the

"Effective Date").

8.      Plaintiff Trustee is an individual residing in Cincinnati, Ohio.  Plaintiff Trustee

has the authority to enforce, sue on, settle or compromise any or all of the Transferred Claims as

a representative of the Debtors' estate pursuant to Section 1123(b) of the Bankruptcy Code.  The

Transferred Claims include any claims of the Debtors against the Defendants.  Plan § 10.5.

### *The Defendants*

9.      Defendant Lee Morgan ("Lee") is an individual residing in Yellow Springs, Ohio,

and was the Chief Executive Officer, ESOP Trustee, and chairperson of the Board of Directors

of Antioch, a member of the Antioch Committee ESOP Advisory Committee, and an insider of

Antioch.  Defendant Lee is the father of Defendant Asha.

10.      Defendant Asha Morgan Moran ("Asha") is an individual residing in St. Cloud,

Minnesota and was the Chief Executive Officer of Antioch, a director of Antioch, a member of

the Antioch Committee ESOP Advisory Committee, and an insider of Antioch.  Defendant Asha

is the daughter of Defendant Lee and the spouse of Defendant Marty Moran.

11.      Defendant Chandra Attiken ("Attiken") is an individual residing in Mt. Vernon,

Ohio, and was the Vice President – Human Resources, an officer of Antioch, a member of the

Antioch Committee ESOP Advisory Committee (defined in this Complaint), and an insider of

Antioch pursuant to 11 U.S.C. § 101(31).

12.     Defendant Steve Bevelhymer ("Bevelhymer") is an individual residing in Belbrook, Ohio, and was the Treasurer, an officer of Antioch, and an insider of Antioch.

13.     Defendant Nancy Blair ("Blair") is an individual residing in Calgary, AB, Canada and was an officer of Antioch, a director of Antioch, the chair of Antioch's special committee, and an insider of Antioch.

14.     Defendant Ben Carlson ("Carlson") is an individual residing in Centerville, Ohio and was a director of Antioch and an insider of Antioch.

15.     Defendant Candlewood Partners, LLC ("Candlewood") is a Illinois limited liability company with its principal place of business in Chagrin Falls, Ohio.

16.     Defendant CRG Partners Group, LLC ("CRG") is a Delaware limited liability company with its principal place of business in New York, New York.  Defendants Ravaris and Epstein are individuals and were employees of CRG and served as officers and insiders of Antioch.

17.     Defendant Evolve Bank & Trust is an Arkansas corporation with its principal place of business in Memphis, Tennessee and maintains an office in Cincinnati, Ohio.

18.     Defendant Karen Felix is an individual residing in Middletown, Delaware, and was the Chief Financial Officer of Antioch and an insider of Antioch.

19.     Defendant GreatBanc Trust Co. ("GreatBanc") is an Illinois corporation with its principal place of business in Lisle, Illinois.

20.     Defendant Barry Hoskins ("Hoskins") is an individual residing in Black Diamond, Washington and was the Chief Financial Officer, ESOP Trustee, an officer of Antioch, and an insider of Antioch.

21.     Defendant Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan Lokey") is a California corporation with its principal place of business in Los Angeles, California.

22.     Defendant Kimberly Lipson-Wilson ("Lipson-Wilson") is an individual residing in Englewood, Ohio and was the Former Director of Compliance, Sub-Trust Trustee, ESOP Trustee, an officer of Antioch, and an insider of Antioch.

23.     Defendant Wayne Alan Luce ("Luce") is an individual residing in Asheville, North Carolina, and was a director of Antioch and an insider of Antioch.

24.     Defendant Jeanine McLaughlin ("McLaughlin") is an individual residing in Pompano Beach, Florida and was a director of Antioch and an insider of Antioch.

25.     Defendant Marty Moran is an individual residing in St. Cloud, Minnesota and was an insider of Antioch.  Defendant Marty Moran is the spouse of Defendant Asha.

26.     Defendants Lee Morgan GDOT Trust #1, Lee Morgan GDOT Trust #2, Lee Morgan GDOT Trust #3,  Lee Morgan Pourover Trust #1, and Lee Morgan Pourover Trust #2 (collectively, the "Morgan Trusts") are, upon information and belief, trusts established to hold legal title to certain interests for the benefit of Lee Morgan and members of his family.  The Morgan Trusts were insiders of Antioch.

27.     Defendant G. Robert Morris ("Morris") is an individual residing in Memphis, Tennessee and was a director of Antioch and an insider of Antioch.

28.     Defendant James Northrup ("Northrup") is an individual residing in Vermontville, New York, and was a director of Antioch and an insider of Antioch.

29.     Defendant Reliance Trust Company ("Reliance") is a Georgia bank and trust company with its principal place of business in Atlanta, Georgia.

30.     Defendant Denis Sanan ("Sanan") is an individual residing in Santa Barbara, California, and was a director of Antioch and an insider of Antioch.

31.     Defendant Malte von Matthiessen ("von Matthiessen") is an individual residing in Almont, Colorado, and was a director of Antioch and an insider of Antioch.

32.     Defendant Frederick Walker ("Walker") is an individual residing in Westlake Village, California, and was the President of Creative Memories, North America, a subsidiary of Antioch, and an officer of Antioch and an insider of Antioch.

## FACTUAL ALLEGATIONS

33.     The Debtors were one of the world's largest direct-sales scrapbook and accessory suppliers.  Operating from two primary facilities—one in St. Cloud, Minnesota, and one in Yellow Springs, Ohio—the Debtors sold a product line of "memory celebration" products under the "Creative Memories" brand.  Sales consultants for Creative Memories marketed scrapbooking products to their customers and recruited other consultants to join the business.

34.     Antioch underwent a dramatic transformation in 2003, when it became wholly owned by the ESOP in a transaction designed to benefit the Company's insiders.  After that transaction, the Company was left with too much debt and not enough cash.  Self-interested insiders and negligent professionals further drove the Company into decline, culminating in Antioch's bankruptcy filing.

### *The Morgan Family*

35.     Members of the Morgan family played key roles in Antioch's decline.

36.     Defendant Lee is the son of Ernest Morgan, Antioch's co-founder.  Lee joined Antioch as Treasurer in 1968 and took over as President and Chief Executive Officer in 1971 and chairperson of the Board in 1993.

37.     Defendant Asha, Lee's daughter, served as Chief Operating Officer from September 2000 through July 2008, when, after her father's retirement, she was appointed President and Chief Executive Officer.

38.     As of the Petition Date, Defendants Lee and Asha and other members of the Morgan family, including certain of Lee's grandchildren, held significant subordinated debt and equity interests in the Debtors.

39.     Defendants Lee and Asha used their roles as insiders, officers, directors, creditors, and equityholders in the Company to influence other stakeholders.  During the events leading to the filing of the bankruptcy petitions, Defendants Lee and Asha acted aggressively to persuade others that the Company must continue under the Morgan family's leadership at any cost.

40.     Defendants Lee and Asha, along with the officers and directors they enlisted (many of whom were family friends), maintained overlapping and conflicting positions in the Company.  These conflicts of interest led the Morgan family and the officers and directors to take actions that were contrary to the Company's best interests.

### The ESOP

41.     One of the most significant events precipitating Antioch's financial decline occurred when the Company became wholly owned by the ESOP.

42.     The ESOP was established in 1979 to provide certain retirement benefits for employees.   When an employee left Antioch, his or her stock interest was redeemable by Antioch in cash or installment payments.  Historically, this repurchase liability was a major annual expense for Antioch.  The average repurchase liability for ESOP stock incurred by Antioch for the five years preceding 2003 was approximately $12 million to $14 million per year.

43.     By 2003, Antioch had over 1,200 full-time employees, and the ESOP owned

42.8% of the Company's stock.  The remaining stock was owned by approximately 47

individuals and trusts.  Defendants Lee and Asha owned shares, as did Defendants Carlson,

McLaughlin, Sanan, and von Matthiessen, who served as directors, and Defendants Blair,

Hoskins, and Attiken, who served as officers.

44.     This ownership structure had tax implications for the Company and for the non-

ESOP shareholders.  Antioch elected subchapter S corporate status, requiring the non-ESOP

shareholders to pay taxes on corporate earnings.  The ESOP, however, was not subject to income

tax liability on dividends or other distributions.  It was Antioch's practice to distribute 45% of its

taxable income to its shareholders.  The non-ESOP shareholders used this distribution to pay

their income tax obligations, while the ESOP allocated its distribution to the participant

accounts.

45.     During 2003, Defendants Lee and Asha became interested in researching methods

to liquidate their personal substantial holdings in Antioch and to diversify their assets—all while

reaping tax savings and maintaining their leadership positions in the Company.

46.     The ESOP was governed by an advisory committee.  In 2003, that committee

consisted of Defendants Lee, Asha, and Attiken (the "ESOP Advisory Committee").

Consequently, Defendants Lee, Asha, and Attiken had discretionary authority over plan

administration and investments and directed the actions of the ESOP's trustee (then Defendant

Hoskins, who was also a non-ESOP shareholder).  Defendant Lee served as chairperson of the

advisory committee and could only be removed by unanimous consent of the board of directors,

excluding his vote.  Defendants Lee, Asha, and Attiken, by virtue of their positions on the ESOP

Advisory Committee, were fiduciaries under ERISA and were uniquely situated to investigate

and implement changes to the ESOP that would benefit the non-ESOP shareholders.

47.     Defendants Lee, Asha, and Attiken, with the assistance of advisors from Deloitte

& Touche LLP ("Deloitte"), explored a leveraged ESOP transaction.  Because the ESOP was a

tax-exempt entity, Defendants Lee, Asha, and Attiken discovered that 100% ownership of

Antioch by the ESOP would save an estimated $290 million in federal income taxes over a ten-

year period, with members of the Morgan family, as the largest non-ESOP shareholders,

capturing the vast majority of those savings.

### *The Proposed ESOP Transaction*

48.     With these benefits in mind, Defendants Lee, Asha, and Attiken, along with

Deloitte and the Company's counsel, devised a transaction that would result in the ESOP owning

100% of Antioch's shares without shifting power from the Morgan family to the ESOP trustee.

49.     Defendants Lee, Asha, and Attiken, with the assistance of the Company's

counsel, proposed that Antioch would make a tender offer to purchase the non-ESOP

shareholders' shares.  The Company would incur significant debt to purchase the shares and then

merge into a new Company that would be wholly-owned by the ESOP.

50.     To facilitate this transaction, Antioch hired a number of professionals.  Defendant

Hoskins was a conflicted non-ESOP shareholder and was directed as trustee by Defendants Lee,

Asha, and Attiken, who were also conflicted non-ESOP shareholders.  Because of these

conflicts, after the Company decided to proceed with the transaction, it retained Defendant

Greatbanc to serve as the ESOP trustee.  Antioch also retained Defendant Houlihan Lokey to

provide an opinion on the transaction's fairness.

51.     The Company needed to establish the consideration it would offer to pay each non-ESOP shareholder for their shares.  One year earlier, the ESOP had retained an independent appraiser, Business Valuations, Inc. ("BVI"), to value Antioch's equity and the ESOP shares as of December 31, 2002.  BVI considered Antioch's repurchase liability and a lack of marketability in conducting its valuation.  BVI valued Antioch's total equity at $333.2 million on a minority interest basis and the ESOP shares at $680 per share.

52.     In formulating the ESOP transaction, the Company valued its shares at $850 per share, even though the transaction occurred only one year after BVI opined that the ESOP shares were valued at $680 per share.  As discussed below, this valuation significantly benefited insiders to the detriment of the Company.

### The Conflicting Interests of the Directors

53.     The board of directors considering the proposed transaction consisted of Defendants Lee, Asha, Carlson, Luce, McLaughlin, von Matthiessen, and Sanan.  Two employee-owners, Sandy Borstad and Deborah Brooks-Cain, also served on the board.  With the exceptions of Defendants Luce, Borstad, and Brooks-Cain, all of the directors were non-ESOP shareholders.  Using a valuation of $850 per share, these conflicted directors were in a position to profit considerably from the transaction.

54.     At the time the board considered the proposed transaction, Defendant Lee, personally and through the Defendants Morgan Trusts, owned 68,638 eligible shares (or 14.2% of the total outstanding shares) of the Company.  With the Company proposing to purchase shares at $850 each, Defendant Lee stood to gain $58,112,800 in the transaction.  Additionally, Defendant Asha owned 94,721 shares (or 19.7% of the total outstanding shares) and stood to gain $80,512,850 in the transaction. Other members of the Morgan family, through Matthew

Morgan (Defendant Lee's son) and certain of the Morgan grandchildren, owned an additional

60,167 shares (or 12.6% of the total outstanding shares) and stood to gain $51,141,950 in the

transaction.

55.     Defendant Carlson owned 1,750 shares and stood to gain $1,487,500 in the

transaction.

56.     Defendant McLaughlin owned 2,596 shares and stood to gain $2,206,000 in the

transaction.

57.     Defendant Sanan owned 6,880 shares and stood to gain $5,848,000 in the

transaction.

58.     Defendant von Matthiessen owned 1,270 shares and stood to gain $1,079,500 in

the transaction.

59.     The board of directors collectively owned, directly and indirectly, 85.9% of the

non-ESOP shares and stood to take $200,618,700 in cash or other consideration out of the

Company in the transaction.

60.     The conflicted members of the board did not fully disclose their interests in the

transaction to the non-conflicted directors during discussions regarding the transaction.  Some

non-conflicted members of the board were entirely unaware that other members of the board

were non-ESOP shareholders and would profit from the transaction during these discussions.

61.     The directors and officers ignored expressions of concern regarding the

disproportionate benefits the transaction would confer on non-ESOP shareholders.  When

Defendant GreatBanc expressed such concern, Defendants Lee and Hoskins reacted by

considering GreatBanc's removal as trustee.  Defendant GreatBanc also suggested that Antioch

obtain an additional appraisal from an independent appraiser prior to the transaction, but

Defendant Lee refused to follow Defendant GreatBanc's advice.

62.     Defendant Lee also dismissed questions regarding the significant debt the

Company would acquire to facilitate the transaction.  Defendant Lee assured all stakeholders that

the Company would have no difficulties servicing this debt.

63.     Upon information and belief, the board of directors never fully considered the

effect of the transaction on Antioch and instead discussed at length the effect of the transaction

on non-ESOP shareholders.

64.     Defendants Lee and Asha, with the assistance of Defendant Attiken, persuaded

the Board that the transaction was necessary for tax reasons.

65.     Upon information and belief, Defendant Lee assured directors that they would be

indemnified if any legal action resulted from the transaction.

66.     On October 30, 2003, the board, though conflicted by self-interests and

inadequately informed, voted to approve the transaction.  Only Brooks-Cain, who was not

present at the meeting, did not vote in favor of the transaction.  None of the conflicted directors

abstained from deliberating or voting on the transaction.

67.     The directors and officers never obtained an independent appraisal from the

perspective of the Company before determining whether to approve the transaction.  Instead,

they relied on a letter from Defendant Houlihan Lokey, even though that letter expressly

disclaimed any advice as to whether Antioch should engage in the transaction.

### The Tender Offer

68.     On November 14, 2003, Antioch issued a prospectus and tender offer to the non-

ESOP shareholders, including Defendants Lee, Asha, Attiken, Blair, Hoskins, Carlson,

McLaughlin, Sanan, von Matthiessen, and the Morgan Trusts.  Antioch's offer to buy shares

provided that shares could be sold for $850 cash or for a package of consideration consisting of

$280 cash, a $280 subordinated note due in 2013, and a warrant to purchase one share at an

exercise price of $850 in 2014 (the "Package").   Antioch did not limit the amount of cash

shareholders could elect to take as a part of the transaction, but it did limit the number of non-

ESOP shareholders that could elect to take the Package.

69.     After the stock purchase transaction, Antioch would merge into a new Company

owned by the ESOP with the result that the ESOP would own 100% of the shares of Antioch.

The proposed transaction would be financed entirely by use of Antioch's cash and assumption of

additional debt.

70.     This transaction ensured that the Morgan family would continue to direct the

Company, at least until 2014, while reaping the financial benefits of the transaction.  The

members of the Morgan family would receive cash sufficient to pay any tax obligations,

subordinated notes that would provide them a future income stream, and warrants to purchase

stock at an artificial price in the future.

71.     With certain limited exceptions, post-transaction the Company was not permitted

to pay annual dividends greater than $25 million on the common stock without the prior written

consent of the holders of a majority of the warrants.  After 2004, the amount of any contributions

to the ESOP was within the discretion of the board of directors.

72.     The tender offer contained a number of statements assuring stakeholders that the

transaction was fair to non-ESOP shareholders, but it contained very little information regarding

the transaction's fairness to the Company.  The tender offer also claimed that the transaction

would not impair the Company's long-term viability.

73.     The Company engaged in a comprehensive public relations strategy to convince stakeholders, including the Company's employees, that the transaction was necessary and in the best interests of Antioch and its employees.  As part of this strategy, directors and officers communicated to employees that employees would be acting as owners of Antioch who would work harder for less money in the short-term and share in the long-term rewards of that work. Although management frequently talked about employee-ownership, no real change in governance of the Company would occur—Defendants Lee and Asha would continue to make decisions for Antioch.

74.     Defendants Lee and Asha and the directors and officers misled key stakeholders regarding the benefits of the transaction and failed to adequately apprise them of the risks associated with the transaction.

### *The Role of the ESOP Trustee*

75.     The closing of the ESOP Transaction was conditioned on Defendant GreatBanc, as ESOP Trustee, declining to sell any shares in the tender offer.

76.     Defendant GreatBanc did not engage in a good faith process to determine the fair market value of the Antioch shares as of the date of the ESOP transaction.  Upon information and belief, Defendant GreatBanc never obtained an independent appraisal prior to the December 2003 transaction to evaluate the price Antioch offered non-ESOP shareholders, instead relying on an informal valuation prepared by Deloitte for Antioch and upon a fairness opinion from Duff & Phelps, LLC ("Duff & Phelps") that used flawed methodology.  Specifically, the Duff & Phelps opinion failed to sufficiently account for the effect of the repurchase liability and the shares' lack of marketability in arriving at a valuation.  Further, the Duff & Phelps' opinion was narrowly focused on whether the consideration and other terms and conditions of the transaction

were fair to the ESOP from a financial point of view, and the opinion failed to analyze whether the transaction was in the best interest of the Company.

77.     Defendant GreatBanc agreed to decline to sell ESOP shares in the tender offer and to approve the transaction in exchange for a Put Price Protection Agreement.  The Put Price Protection Agreement established special distribution rules applicable to all ESOP participants who terminated their employment during the period of January 1, 2003 through September 30, 2006.  Each of the non-ESOP shareholders agreed to the tender offer, requiring Antioch to redeem all of their shares pursuant to the terms of the tender offer.  As a result, on December 16, 2003, the transaction closed.  Shortly following the transaction, GreatBanc's engagement as ESOP trustee ended.

### The Improper Nature of the Transaction

78.     Defendants Lee and Asha and other members of the Morgan family received approximately $111,424,500 in cash as a result of the ESOP transaction.  Other directors, including Defendants Carlson, McLaughlin, Sanan, and von Matthiessen, collectively received at least $25 million in consideration.

79.     Given the conflicts of interest and absence of disinterested directors, an independent opinion was the only way to ensure that the transaction would not be voidable. However, the directors and officers never sought or obtained an independent opinion as to whether the transaction was fair to Antioch as purchaser or whether it was prudent for the Company to effect the transaction.

80.     The directors and officers owed fiduciary duties to Antioch of good faith, loyalty, and disclosure and to refrain from self-dealing and other conflicts of interest.  They also had a duty to avoid wasting and mismanaging corporate assets.

81.     The directors and officers knew or reasonably should have known that their actions in causing Antioch to enter into the 2003 ESOP transaction violated their fiduciary duties as directors and officers under Ohio law.

82.     As members of the ESOP Advisory Committee, Defendants Lee, Asha, and Attiken knew or reasonably should have known that causing Antioch to enter into the ESOP transaction violated their obligations as ERISA fiduciaries of the ESOP.

83.     The officers and directors knew or reasonably should have known that the 2003 ESOP transaction was a "prohibited transaction" under ERISA Sections 406 and 408, which would result in violations of ERISA and tax law by both the individual directors and Antioch. These violations were likely to result in substantial injury to the corporation and its constituents, including disqualification of the ESOP, loss of 100% S-Corp status, and loss of tax exempt status, resulting in significant tax liability.

84.     The directors and officers knew or reasonably should have known that a majority of the directors were subject to conflicts of interest with regard to the ESOP Transaction.  The directors and officers knew or reasonably should have known that the transaction would be voidable unless it could be shown to be fair to Antioch.  The directors and officers knew or reasonably should have known that they had a duty to seek independent advice as to the fairness and prudence of the transaction as to Antioch and to independently review and analyze the opinions received from all professional advisors.

85.     The directors and officers apparently believed that it was sufficient to rely on their financial advisors.

86.     These advisors, including Deloitte and Defendant Houlihan Lokey, appeared to be focused on structuring and justifying the transaction to benefit the selling non-ESOP

shareholders, rather than providing objective advice as to whether the transaction was in the best interests of Antioch.

87.    The directors and officers should have focused on the best interests of Antioch rather than the interests of the selling non-ESOP shareholders, and they failed to do so.

### *The Aftermath of the Transaction*

88.    The ESOP transaction did not ultimately benefit the ESOP.  The ESOP's 100% ownership of Antioch was significantly diluted by the issuance of notes and warrants as part of the Package that some non-ESOP shareholders, including Defendants Lee and Asha and the Morgan Trusts, were able to elect.

89.    Moreover, because of the transaction, the ESOP received 25% less in annual distributions compared to the distributions it received in previous years, and the amount of future dividends and contributions was subject to the discretion of the directors, who had conflicting interests as holders of warrants and notes.

90.    The transaction also left the Company disastrously undercapitalized and overleveraged.  Antioch paid out $46 million of its cash and borrowed an additional $109 million to fund the transaction, substantially increasing Antioch's debt to equity ratio.  The transaction resulted in Antioch's interest-bearing debt rising from $10.8 million as of December 31, 2002 to $201 million as of December 31, 2003.

91.    The directors and officers assumed that the Company would be able to service this debt as long as the annual repurchase liability associated with the ESOP did not exceed $12 million each year.  This assumption was optimistic at best, given that the historical repurchase liability was $12 million to $14 million per year prior to the enlargement of the ESOP.  Unsurprisingly, this assumption did not hold.

92.    In accordance with the put price protections negotiated as a part of the transaction, Defendant GreatBanc retained Prairie Capital Advisors ("Prairie Capital") to value Antioch's stock for ESOP purposes as of December 31, 2003.

93.    Prairie Capital issued its valuation report in early 2004.  In its report, Prairie Capital valued Antioch's equity at $894 per share on an ESOP minority interest basis post-transaction.  In arriving at this valuation, Prairie Capital applied a 5% lack of marketability discount.  The report did not discuss Antioch's repurchase liability or how that liability affected the overall fair market value.

94.    Upon information and belief, Prairie Capital's valuation did not reflect Antioch's actual financial condition or the market value of Antioch's stock.

95.    Prior to October 1, 2004, Antioch's sales began declining.  In addition, a number of employees resigned or were terminated.  These resignations and terminations triggered the Put Price Protection Agreement and locked in the value of resigning employees' ESOP accounts at $894 per share based on Prairie Capital's valuation.  The repurchase liability continued to grow as the Company downsized.  Despite management's awareness of the Put Price Protection Agreement and Prairie Capital's valuation, the officers decided to terminate large numbers of employees following the transaction.  Between 2004 and 2007, 800 employees were terminated or resigned, resulting in repurchase liability of $190 million.

96.    Because Antioch's repurchase liability increased with the 2004 terminations, it defaulted under its financial covenants with the lenders who provided financing for the 2003 transaction.

97.    As a result, Antioch had to restructure its debt and borrow additional funds to meet its repurchase obligations.

98.     The restructure did not solve Antioch's financial problems.  By the end of 2004, Antioch had paid out almost $75 million in ESOP repurchase obligations and undertaken an additional $30 million in note debt to departing employees (the "ESOP Notes").

### Continued Financial Decline

99.     The financial difficulties created by the ESOP transaction continued to spiral, as sales further declined in late 2004 and 2005.  The directors and officers ignored the urgency of the Company's financial problems, used unrealistic financial projections in discussions with the Company's lenders and employee-owners, and concealed the true state of the Company's finances from employee-owners.  Defendants Lee and Asha and other directors and officers ignored warnings from Richard Wiser, a key member of the Company's financial staff, that the projections were too optimistic and that the financial situation was deteriorating.

100.     The directors and officers also continued to ignore the multiple serious conflicts presented by the Morgan family's ownership of Antioch debt and warrants.  Defendant Hoskins served as both a directed ESOP trustee (working at the instruction of Defendants Lee, Asha, and Attiken) and the trustee for the Morgan family subordinated notes.  In that role, he negotiated a swap of warrants to maintain compliance with the anti-abuse rules of Internal Revenue Code Section 409p.  The officers and directors made no provision to deal with the conflict created by Defendant Hoskins' service as both ESOP trustee and trustee for the Morgan family trust.

### The Levimo Sale and Leaseback

101.     At least as early as 2007, Antioch was in severe financial distress and the zone of insolvency, triggering the directors' and officers' fiduciary duties to Antioch's creditors.

102.     On March 20, 2007, the board hired Defendant Houlihan Lokey to help identify potential purchasers or lenders.

103.     On April 9, 2007, the board of directors approved a sale and leaseback transaction of the building located at 3001 Clearwater Road, St. Cloud, Minnesota (the "Facility").  Antioch sold the Facility to Levimo, LLC ("Levimo"), an entity owned and controlled by the Morgan family.  Levimo purchased the Facility, along with a building located at 8th Avenue, St. Cloud, Minnesota, for $25,809,742.  Defendant Lee and Defendant Marty Moran negotiated the sale for Levimo.

104.     Levimo leased the Facility and the 8th Avenue property back to Antioch for Creative Memories' use.  Antioch's lease with Levimo acknowledged that certain "affiliates" of Levimo were conflicted as to the transaction and purported to waive that conflict, even in the event of a bankruptcy filing.

105.     The directors and officers failed to address the conflict of interest.  The lease with Levimo prohibited Antioch from terminating the lease or setting off any monetary obligations due under the lease.  Further, the lease provided the landlord, Levimo, with a host of remedies on Antioch's default.  Defendant Lee, in his capacity as Antioch's president, had an obligation to ensure that Antioch did not default under the Lease, but, in his capacity as landlord, Defendant Lee also had an interest in ensuring that he received the maximum payments under the lease.  The directors and officers appear to have made no provisions to guard against this conflict.

### The Dueling Sale Processes

106.     The Levimo transaction did not "stop the bleeding" at Antioch.

107.     On April 17, 2007, Antioch was forced to enter into a new credit agreement, again refinancing its debt with its senior lenders.  The directors and officers failed to apprise the Company's senior lenders prior to closing the refinancing transaction that it had engaged Houlihan Lokey to sell the Company.

108.    On May 10, 2007, the board of directors, consisting of Defendants Lee, Asha, Blair, McLaughlin, Luce, von Matthiessen, Sanan, and an employee-owner representative, formed a committee (the "Special Committee"), consisting initially of Defendants Lee, Asha, Blair, and von Matthiessen, to examine Antioch's alternatives for restructuring.  By as late as May 30, 2007, the directors and officers had not told the Company's senior lenders about the Company's engagement of Defendant Houlihan Lokey—a decision consistent with the directors' and officers' ongoing effort to conceal the Company's true financial state from its stakeholders. On May 18, 2007, Defendant Bevelhymer reported to Defendants Lee and Asha that Antioch's decline in sales guaranteed that Antioch would breach its financial covenants and be unable to service its debt within the year.  Consequently, in Defendant Bevelhymer's opinion, the sale of the Company was mandatory.

109.    Antioch's restructuring alternatives were complicated by the 100% ESOP S-Corp structure, as well as by the ESOP Notes and the subordinated notes and warrants issued as part of the Package.  Both the subordinated notes and the warrants contained "change of control" provisions, making the notes immediately payable in full and the warrants exercisable if (i) the individuals constituting the board of directors as of the date of the ESOP transaction ceased to constitute a majority of the members of the board; (ii) the Company sold or leased substantially all of its assets to any person or entity not controlled by the Company; or (iii) the Company undertook a merger, consolidation, or other reorganization involving the Company becoming owned by another entity such that the outstanding voting securities would be held in different proportions following the transaction.  In other words, Defendants Lee, Asha, Attiken, and the conflicted directors and officers who held subordinated notes and warrants, enabling them to

"cash out" in a variety of ways, with the help of the Antioch's counsel, ensured that any change in power over the Company would benefit them and come at great cost to the Company.

110.    The Morgan family's significant holdings of Antioch debt and warrants also complicated matters for the Company.  Antioch employees and particularly Defendant Lipson-Wilson, spent hours devising a strategy to maintain compliance with the Internal Revenue Code in light of Defendant Lee's interests in the Company.

111.    On August 22, 2007, the board resolved to transfer shares allocated to Defendant Lee, a "disqualified person" under I.R.C. Section 409p, to a sub-trust of the Antioch Employee Savings Plan (the "Sub-Trust") in order to maintain compliance with the anti-abuse rules of Section 409p and to maintain less than 48% 409p ownership by disqualified persons as directed by the ESOP plan documents.

112.    As the Special Committee began its work, it became clear that the interests of the Company and the Morgan family continued to conflict.  The membership of the Special Committee was subsequently changed to exclude Defendants Lee and Asha and to include Defendants McLaughlin, Luce, and Sanan, along with Defendants Blair and von Matthiessen.

113.    The board engaged Defendant Reliance to serve as an "independent" ESOP trustee, replacing Defendant Lipson-Wilson, in June 2007.  In August 2007, the directors retained Reliance as a discretionary ESOP trustee to approve any transaction.

114.    Houlihan Lokey focused its efforts on finding a going concern purchaser for the Company.  Houlihan Lokey received letters of interest from at least three separate entities. These entities made it clear that they would not allow Defendants Lee and Asha to continue in their current positions.

115.    This did not please Defendants Lee and Asha.  Defendant Lee expressed his
dissatisfaction with Defendant Houlihan Lokey in multiple emails to Defendant Blair, who
eventually chaired the Special Committee.  As early as August 2007, Defendant Lee, with input
from Defendant Asha and the assistance of Defendant Marty Moran, separately hired Defendant
Candlewood as a financial advisor for the Morgan family.  Defendant Lee engaged Candlewood
to explore refinancing or recapitalization options that would allow the Morgan family to
maintain their interests and power in Antioch.  The Morgan family began exploring alternatives
to the sale long before Houlihan Lokey reported the ultimate results of its efforts to find a buyer
for Antioch.

116.    Defendant Lee pressured the Special Committee and the board to include
Defendant Candlewood in meetings regarding the sale process and to compensate Candlewood
and Defendant Lee's personal attorneys for their work.  Upon information and belief, Antioch
ultimately made payments or planned to make payments to Candlewood even though
Candlewood represented the Morgans' interests, not Antioch's.

117.    The Special Committee allowed Defendant Lee and Defendant Candlewood to
pursue a recapitalization while Defendant Houlihan Lokey continued to examine the Company's
strategic alternatives.  Both Defendant Houlihan Lokey and Defendant Candlewood thought that
the other professional's work interfered with and jeopardized the potential for a successful
outcome for the Company.  However, both Defendant Houlihan Lokey and Defendant
Candlewood continued to remain engaged and to demand payment from the Company for their
services.

118.    The Special Committee knew that both Defendant Houlihan Lokey and Defendant
Candlewood thought that the other professional's work interfered with and jeopardized the

potential for a successful outcome for the Company.  The Special Committee continued to

engage in discussions with both advisors, to allocate Company resources to pay Defendant

Houlihan Lokey, and to negotiate with Defendant Lee terms for paying Defendant Candlewood.

119.    Defendants Attiken, Lipson-Wilson, Felix, Bevelhymer, Epstein, Ravaris, and

Walker, the Company's officers, were aware of and assisted in the simultaneous engagement of

Defendant Houlihan Lokey and Defendant Candlewood.  The officers assisted the Morgan

family in efforts to pursue recapitalization alternatives while Defendant Houlihan Lokey

attempted to find a purchaser for Antioch.

120.    Neither the directors nor the officers fully committed to working with Defendant

Houlihan Lokey.

121.    Defendant Houlihan Lokey's task was also complicated by the Company's

continuing failure to formulate accurate financial projections.  Defendants Lee and Asha ignored

additional information Richard Wiser provided to them regarding the Company's financial crisis.

Defendant Asha insisted on using numbers that were more optimistic than realistic in order to

persuade other stakeholders that the Company's finances were not as dire as they actually were.

122.    The directors and officers, by engaging multiple professionals with inconsistent

objectives, jeopardized realistic alternatives for the Company and wasted the Company's sparse

cash on professional fees.

123.    By October 2007, Defendant Houlihan Lokey had received expressions of interest

from two potential buyers, with whom it worked extensively on due diligence issues.  After the

Company made multiple downward adjustments to its financial forecasts, both prospects

declined to submit formal bids.  One of these buyers questioned the accuracy of the ESOP

valuations, which concern was shared with the entire board.   Defendant Lee seized the

opportunity to pressure the Special Committee and the directors to grant Defendant Candlewood

an exclusive period to find an investor or financing to support the Morgan's continued control.

Defendant Lee also pressured the Company to compensate Candlewood and Lee for their efforts

in trying to effect a transaction with the Morgan family.

124.    Defendants Lee and Asha also pressured the board with respect to the ESOP

Trustee.  The directors attempted to strip Reliance of any true independence by passing a

resolution dated October 4, 2007, instructing Reliance that any proposed sale of the Company

that did not fully pay all outstanding debt and result in some value to the shareholders would not

be supported by the board.  The board remained in denial as to the desperately urgent financial

decline of the Company.

125.    In November 2007, at the request of Antioch's senior lenders, the Special

Committee engaged Defendant CRG to assist the Company in preparing a 13-week cash flow

analysis.  During the course of Defendant CRG's engagement, Defendants Ravaris and Epstein

took over as Chief Restructuring Officer and Chief Financial Officer, respectively.

126.    On more than one occasion, Defendant Lee informed the Special Committee of

the Morgan family's position as the largest creditor of the Company and stated that he was not

prepared to compromise the obligations owed by the Company to the Morgan family in order to

enable a sale to an outside buyer, even if an outside sale was in the best interest of the Company.

Defendant Lee repeatedly put his own interests ahead of his fiduciary duties to the Company and

its stakeholders.

127.    Defendant Reliance quickly understood Antioch's dire financial condition and the

conflicts between the self-interests of directors and officers and the Company's best interests.

Reliance communicated to Antioch's senior lenders that it planned to resign before notifying the

Company.  On November 28, 2007, Reliance gave formal notice of its resignation as ESOP

trustee, effective December 28, 2007, explaining that it believed that the entire board should be

removed and members of key management replaced.  Reliance told Defendant Lipson-Wilson

that the members of the board holding subordinated debt were completely conflicted and that the

Company should have pursued a turnaround effort three years earlier.  The ineffectual and

conflicted management had eroded the ESOP's interest in the Company, and Reliance refused to

commit the resources necessary to sort through the issues and assist with a restructuring of the

Company.

128.    Defendant Lipson-Wilson forwarded this information from Reliance to

Defendants Felix and Blair and to the Company's counsel.  Other members of the board later

learned of Reliance's concerns.

129.    Although Defendant Reliance—an independent, objective professional—

expressed misgivings regarding the 2003 ESOP transaction and the competence of past and

current directors and officers, no one acted on Reliance's concerns.

130.    The ESOP trust agreement required Defendant Reliance to file a comprehensive

report regarding the ESOP upon its resignation.  Upon information and belief, Reliance did not

file such a report.

131.    Despite its concerns, Defendant Reliance ignored its fiduciary duties to the ESOP

and resigned rather than taking any action to deal with the 2003 transaction and the conflicted

board.

132.    Despite learning of Reliance's concerns, the directors and officers failed to take

any action to deal with the 2003 transaction or to address their conflicts of interest.

133.    Defendant Reliance's counsel helped recruit Defendant Evolve to serve as ESOP trustee after Reliance's resignation.  Reliance's counsel then served as Evolve's counsel.  Reliance's counsel discussed the reasons for Reliance's resignation with Defendant Evolve prior to Evolve's engagement.

134.    Antioch's directors and officers told Defendant Evolve that Reliance resigned because its engagement required more time than it anticipated when it established its fees.  This information was misleading in its incompleteness.  Defendant Reliance felt its engagement would require additional time because of its concerns about the 2003 transaction, the directors and officers, and the need for the ESOP trustee to take a more active role in the Company.

135.    Defendant Evolve failed to take any action regarding the 2003 transaction and the directors' and officers' conflicts.

136.    In February 2008, Defendants Lee, Asha, and certain of the directors, attorneys and financial advisors attended a meeting in Chicago, Illinois.  The participants at the meeting agreed to permit the Morgan family to work toward a consensual transaction that would allow the Morgan family to retain controlling positions in Antioch, in preference over any transaction in which independent buyers or investors would acquire a controlling interest in Antioch.

137.    Defendant Lee urged the Special Committee to delay any sale process until after the ESOP Notes came due in June.  In so doing, Defendant Lee ignored Antioch's urgent cash flow issues and further jeopardized any sale of the Company.  All of the professionals engaged by Antioch stressed that a negotiated resolution with the ESOP Noteholders would be critical to a restructuring of the Company and extremely difficult to accomplish outside of a bankruptcy process.  Defendant Lee's personal advisors also explained to him how critical the ESOP Notes would be to any restructuring of the Company.

138.     However, Defendants Lee and Asha, as holders of subordinated notes and warrants and as landlord of the St. Cloud property, were conflicted in any negotiations with the holders of ESOP Notes.  The Morgan family pursued deal structures that would have given themselves, as subordinated noteholders, preferential treatment over other unsecured creditors, including the holders of the ESOP Notes.

139.     The directors and officers, by announcing a preference for a consensual transaction with the Morgan family to any acquisition by an independent purchaser, significantly chilled interest of parties looking to acquire or invest in Antioch.  It was clear to potential purchasers that Defendants Lee and Asha, who were still serving as officers, directors, landlord, and holders of debt and equity, disfavored any transaction that would involve new leadership at Antioch.  Potential purchasers knew that the directors and officers had acquiesced in Defendants Lee's and Asha's attempts to remain in power at Antioch and that their attempts to acquire Antioch would be ultimately futile.

140.     Defendants Lee, Asha, Marty Moran, and Candlewood presented a number of proposals to Antioch, but none involved committed financing and none adequately addressed the structural, financial, and legal issues Antioch faced.  Despite these shortcomings, the officers and directors continued to allow Defendants Lee, Asha, and Candlewood to pursue a process that jeopardized and ultimately doomed the efforts of Defendant Houlihan Lokey—the only advisor engaged on the Company's behalf.

141.     Throughout this process, Defendant Lee pressured the Special Committee to terminate Defendant Houlihan Lokey and to cease any pursuit of a sale process to an outside buyer.

### *The J.H. Whitney Proposal and the Replacement of the Board*

142.     Despite the difficulties created by the board's ambivalence and the Morgan family's interference, Defendant Houlihan Lokey continued to identify potential purchasers for the Company.

143.     In early June 2008, Antioch was in the late stages of a sale process under a letter of intent signed by J.H. Whitney ("Whitney").  Whitney had offered to purchase Antioch's assets pursuant to Section 363 of the Bankruptcy Code for $54 million.

144.     Defendants Lee and Asha did not want the Whitney deal to close and scrambled to approach the board with another offer for a Morgan family recapitalization.

145.     The Morgan family created Mamamo, LLC for the purpose of making an offer to recapitalize Antioch using a lien facility of up to $8 million and a letter of credit in the amount of $7 million.  On June 4, 2008, the Special Committee rejected this proposal.

146.     When the Mamamo deal was rejected, Defendants Lee and Asha decided to replace the Antioch board.  On or about June 5, 2008, Defendants Lee and Asha secretly prevailed upon Defendants Evolve and Lipson-Wilson, in her capacity as trustee of the Sub-Trust, to fire the board of directors and to replace them with a board consisting only of Lee, Asha, and one other director.  The purpose of this coup was to thwart the Whitney deal in favor of a transaction with the Morgan family.

147.     Defendants Evolve and Lipson-Wilson followed Defendants Lee's and Asha's instructions.  They voted to fire the directors and to replace them with Defendants Lee, Asha, and Morris (collectively, the "New Board"), an attorney selected by Evolve to serve on the New Board.  It should have been apparent to Defendants Evolve and Lipson-Wilson that the New

Board, composed two-thirds of Defendants Lee and Asha and only one independent member, would be incapable of making fair and impartial decisions in the best interests of the Company.

148.    Also on June 5, 2008, the Company's senior lenders met with Antioch's financial and restructuring advisors to discuss debtor-in-possession financing necessary to complete the proposed  transaction with Whitney.  At that meeting, the lenders were informed that Defendants Lee and Asha had succeeded in firing the directors and replacing them with the New Board.

149.    The firing of the board caused the Company's situation to shift from precarious to chaotic.  Whitney withdrew its proposal.  Upon information and belief, Whitney believed the Morgan family acted in bad faith and that the Morgan family's ineffective management was eroding Antioch's value.  On June 6, 2008, the senior lenders declared Antioch in default, suspended the lenders' obligations under the credit agreements, declared Antioch's obligations immediately due and payable, and seized Antioch's cash.

### The Defaults Under the ESOP Notes

150.    Under the leadership of Defendants Lee, Asha, Morris and Defendant CRG, Antioch's financial situation further deteriorated.

151.    The directors and officers realized that Antioch did not have sufficient cash to make payments due under the ESOP Notes.   This issue should not have presented a problem because the Company was required to obtain adequate security for the Notes.

152.    However, the Company failed to obtain adequate security.  There were four rounds of ESOP Notes.  The first three rounds, issued August 20, 2004, July 11, 2005, and August 2, 2006, were originally guaranteed by Condor Insurance Limited ("Condor Ins."), a Bahamian Company through the issuance of bonds, and, upon information and belief, such bonds were later transferred to Condor Guaranty, Inc. ("Condor").  Condor Ins. filed for bankruptcy

protection in the United States on or about July 26, 2007, and although Antioch's officers,

including Defendants Lipson-Wilson, Felix, Bevelhymer, Blair, Lee, and Asha knew of the

bankruptcy filing, they caused Antioch to issue the fourth round of ESOP Notes on October 1,

2007 with Condor as surety.  By no later than January 2008, Defendants Ravaris, Epstein,

Evolve, Houlihan, Candlewood, Antioch's counsel, and the directors and officers of Antioch all

knew of the situation with Condor.  The directors and officers failed to provide other adequate

security.

153.    In July 2008, Antioch's officers, including Defendants Asha, Ravaris, and

Epstein, determined that Antioch would not be able to make the ESOP Note payments due on

August 1, 2008, due in large part to the freezing of the Company's credit line caused by the

firing of the board.

154.    Despite the officers' and directors' knowledge that Condor was insolvent and that

the Company intended to default on the August note payments, Defendants Ravaris and Epstein

renewed the Condor coverage in August 2008.  Defendant Ravaris then notified Condor of the

Company's default on the ESOP Notes payments due on August 1, 2008 and made a claim under

the guaranty and surety agreement for Condor to make those ESOP Note payments on behalf of

the Company.  To date, Condor has never made any payments in respect of the ESOP Notes and

the holders of the ESOP Notes have not received payments since early 2008.

155.    In communications with holders of the ESOP Notes, Defendant Asha deliberately

misled the noteholders about the Company's financial condition.  Defendant Asha, with

assistance from Defendants Ravaris, Epstein, and CRG, drafted four separate letters dated

August 8, 2008, September 2, 2008, October 2, 2008, and November 1, 2008 to the holders of

the ESOP Notes.  In these letters, Defendant Asha advised the noteholders that Antioch was in

"technical default" under its secured credit agreement and that Bank of America, N.A. ("BOA"), its senior secured lender, would not allow Antioch to make the payments due on the ESOP Notes.  The Company's lenders never prohibited the Company from making payments due on the ESOP Notes.  Instead, the officers decided to mislead the noteholders about the reason for non-payment in order to keep the Company's dire financial situation secret from the employee-owners.  The officers did not want noteholders or employee-owners to know that Antioch simply had insufficient cash to pay the ESOP Notes.

156.    The letters contained other misleading statements.  Although Defendant Asha knew that Condor failed to make the August 2008 payment and that Condor Ins. was insolvent, her September, October, and November letters still assured noteholders that Condor had guaranteed the Notes.

157.    Each letter assured the noteholders that the Company was pursuing a sale process, and even as late as November 1, 2008—twelve days before the Company filed its bankruptcy petition and a prepackaged plan of reorganization that provided for no distributions whatsoever to the noteholders—Defendant Asha assured the noteholders that Antioch was financially strong.

### The Second Whitney Proposal

158.    With the passage of time, Antioch's options dwindled.

159.    In August 2008, the New Board instructed Houlihan Lokey to reapproach Whitney and two other potential purchasers.  Mamamo also generated a new term sheet for a capital infusion.  Although the New Board was now composed of only Defendants Lee and Asha, who had multiple conflicts of interest in considering any sale or restructuring proposal, and Defendant Morris, they had no plan or process in place to ensure an objective evaluation of any offers.

160.    In September 2008, Whitney proposed to purchase Antioch for the significantly lower sum of $22 million.  The New Board rejected Whitney's proposal.

161.    Mamamo never proposed a transaction that provided adequate capital for the Company.

### The Bankruptcy Filing

162.    On November 12, 2008, the New Board approved resolutions to file Chapter 11 petitions.  Defendant Lee abstained from voting.  Defendants Morris and Asha voted in favor of the bankruptcy filing, without any recognition of the conflicts impairing Defendant Asha's judgment.

163.    In the one year prior to the Petition Date, Antioch paid Defendants Houlihan Lokey and CRG and their legal advisors in excess of $5 million.  Upon information and belief, Antioch also paid or planned to pay Defendant Candlewood in excess of $500,000.

164.    Antioch filed a prepackaged plan of reorganization.  Despite the substantial resources Antioch expended to pursue an asset sale, the plan did not contemplate a sale.  Instead, it allowed Antioch to strip itself of the ESOP Notes obligations and obligations to certain disfavored creditors, to leave the Morgan family in day-to-day operational control of Antioch, and to provide the Morgan family with the majority of common stock issued by the Reorganized Debtors.

### COUNT ONE –  BREACH OF FIDUCIARY DUTY IN CONNECTION WITH THE ESOP TRANSACTION (DEFENDANTS LEE, ASHA, CARLSON, MCLAUGHLIN, SANAN, VON MATTHIESSEN, BLAIR AND ATTIKEN)

165.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 164 as if fully rewritten in this paragraph.

166.    The above-named Defendants owed common law and statutory fiduciary duties to Antioch of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

167.    The above-named Defendants knew that the majority of the ESOP Board was conflicted as to the ESOP transaction.

168.    The above-named Defendants failed to obtain an independent opinion as to whether the transaction was fair to Antioch or the prudence of the underlying business decision to effect the transfer.

169.    The above-named Defendants approved the ESOP transaction despite their conflicts of interest and the fact that the ESOP transaction was not in the best interests of Antioch at the time of the transaction, of Antioch in the future, or of Antioch's stakeholders.

170.    As a result, above-named Defendants, jointly and severally, breached their fiduciary duties to Antioch, causing Antioch to suffer damages.

### COUNT TWO – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY IN CONNECTION WITH THE ESOP TRANSACTION (DEFENDANTS LEE, ASHA, CARLSON, MCLAUGHLIN, SANAN, VON MATTHIESSEN, BLAIR, ATTIKEN, GREATBANC, AND HOULIHAN LOKEY)

171.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 170 as if fully rewritten in this paragraph.

172.    The above-named Defendants aided and abetted the breaches of fiduciary duty described in Count One above committed by other of the above-named Defendants, resulting in damage to Antioch.

173.    The above-named Defendants knew that actions taken by other of the above-named Defendants constituted breaches of fiduciary duties.

174.    The above-named Defendants assisted with or encouraged those breaches of fiduciary duties.

175.    As a result, above-named Defendants, jointly and severally, caused Antioch to suffer damages.

### COUNT THREE – BREACH OF FIDUCIARY DUTY RELATED TO CONDOR (DEFENDANTS ASHA, CRG, EPSTEIN, RAVARIS, LIPSON-WILSON, FELIX, HOSKINS AND BEVELHYMER)

176.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 175 as if fully rewritten in this paragraph.

177.    The above-named Defendants owed common law and statutory fiduciary duties to Antioch of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

178.    Defendants Asha, Hoskins, Lipson-Wilson, Felix and Bevelhymer knew or reasonably should have known at the time that the Company issued the ESOP Notes that the Condor bond did not provide adequate security for the Company's obligations.  Despite that knowledge, they issued the ESOP Notes to terminating employees with no other security for payment of the Company's obligations.  In so doing, they wasted and mismanaged corporate assets, and exposed the Company to liability for violations of ERISA and tax law.

179.    The above-named Defendants knew or reasonably should have known that Condor was insolvent or unable or unwilling to honor Condor's obligations with respect to the ESOP Notes.  Despite that knowledge, the above-named Defendants renewed Condor's coverage for the ESOP Notes.  In so doing, the above-named Defendants wasted corporate assets and failed to act as reasonably prudent officers of Antioch.

180.    Moreover, the above-named Defendants failed to provide substitute adequate security for the ESOP Notes.

181.    The above-named Defendants made deliberate misrepresentations to the ESOP Noteholders.

182.    As a result, the above-named Defendants, jointly and severally, caused Antioch to suffer damages.

**COUNT FOUR –  PROFESSIONAL NEGLIGENCE (DEFENDANT RELIANCE)**

183.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 182 as if fully rewritten in this paragraph.

184.    The Company engaged Reliance to serve as independent and discretionary trustee of the ESOP.

185.    Defendant Reliance owed a duty to the Company to exercise skill and knowledge normally exercised by members of their same profession and trade in similar communities, in performance of its role as Trustee of the ESOP.

186.    Defendant Reliance failed to exercise skill and knowledge normally exercised by members of their same profession and trade in similar communities by failing to fully investigate and pursue causes of action related to the 2003 ESOP transaction and by failing to address the directors' and officers' conflicts of interest.

187.    As a result, Defendant Reliance caused Antioch to suffer damages.

**COUNT FIVE –  PROFESSIONAL NEGLIGENCE (DEFENDANT EVOLVE)**

188.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 187 as if fully rewritten in this paragraph.

189.    The Company engaged Evolve to serve as independent and discretionary Trustee of the ESOP.

190.     Defendant Evolve owed a duty to the Company to exercise skill and knowledge normally exercised by members of their same profession and trade in similar communities, in performance of its role as Trustee of the ESOP.

191.     Defendant Evolve failed to exercise skill and knowledge normally exercised by members of their same profession and trade in similar communities by failing to fully investigate and pursue causes of action related to the 2003 ESOP transaction, by failing to address the directors' and officers' conflicts, by voting to replace the board with the New Board despite the fact that two of the three members of the New Board were conflicted, and by rejecting the Whitney proposal and causing Whitney to withdraw as a potential purchaser which was not in the best interest of Antioch or its creditors.

192.     As a result, Evolve caused Antioch to suffer damages.

## COUNT SIX – BREACH OF FIDUCIARY DUTY WITH RESPECT TO THE LEVIMO TRANSACTION (DEFENDANTS LEE, ASHA, BLAIR, MCLAUGHLIN, LUCE, VON MATTHIESSEN, SANAN, LIPSON-WILSON, FELIX, BEVELHYMER, AND ATTIKEN)

193.     The Trustee incorporates by reference the allegations contained in paragraphs 1 through 192 as if fully rewritten in this paragraph.

194.     The above-named Defendants owed common law and statutory fiduciary duties to Antioch and to its creditors of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

195.     The above-named Defendants approved the Levimo transaction despite the conflicts of interest attendant to that transaction and the fact that the transaction was not in the best interests of Antioch.

196.     As a result, the above-named Defendants, jointly and severally, breached their fiduciary duties to Antioch, causing Antioch to suffer damages.

## COUNT SEVEN – AIDING AND ABETTING BREACH OF
## FIDUCIARY DUTY WITH RESPECT TO THE LEVIMO TRANSACTION
## (DEFENDANTS LEE, ASHA, BLAIR, MCLAUGHLIN, LUCE,
## VON MATTHIESSEN, SANAN, LIPSON-WILSON, FELIX,
## BEVELHYMER, ATTIKEN, AND MARTY MORAN)

197.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 196 as if fully rewritten in this paragraph.

198.    The above-named Defendants aided and abetted the breaches of fiduciary duty described in Count Six above committed by other of the above-named Defendants, resulting in damage to Antioch.

199.    The above-named Defendants knew that actions taken by other of the above-named Defendants constituted breaches of fiduciary duties.

200.    The above-named Defendants assisted with or encouraged those breaches of fiduciary duties.

201.    As a result, above-named Defendants, jointly and severally, caused Antioch to suffer damages.

## COUNT EIGHT – BREACH OF FIDUCIARY DUTY WITH RESPECT TO THE SALE
## PROCESS (DEFENDANTS LEE, ASHA, BLAIR, MCLAUGHLIN, LUCE,
## VON MATTHIESSEN, SANAN, LIPSON-WILSON, FELIX, BEVELHYMER,
## ATTIKEN, NORTHRUP, CRG, RAVARIS, EPSTEIN, AND WALKER)

202.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 201 as if fully rewritten in this paragraph.

203.    The above-named Defendants owed common law and statutory fiduciary duties to Antioch and its creditors of good faith, loyalty, and disclosure, to refrain from self-dealing and other conflicts of interest, and to avoid wasting and mismanaging corporate assets.

204.    The above-named Defendants allowed the Morgan family to pursue or failed to prevent the Morgan family from pursuing recapitalization alternatives although the Board was

paying Houlihan Lokey to find a purchaser.  This decision was not in the best interests of

Antioch.

205.    The engagement of multiple professionals providing duplicative services that

were unlikely to be successful and were not successful amounted to a waste of Antioch's assets.

206.    The above-named Defendants failed to provide Antioch with prudent direction

despite Antioch's deteriorating financial position.  This omission harmed Antioch.

207.    As a result, above-named Defendants, jointly and severally, breached their

fiduciary duties to Antioch and its creditors, causing Antioch to suffer damages.

**COUNT NINE – AIDING AND ABETTING BREACH OF FIDUCIARY
DUTY WITH RESPECT TO THE SALE PROCESS (DEFENDANTS LEE, ASHA,
BLAIR, MCLAUGHLIN, LUCE, VON MATTHIESSEN, SANAN, LIPSON-WILSON,
FELIX, BEVELHYMER, ATTIKEN, NORTHRUP, CRG, RAVARIS, EPSTEIN,
WALKER, CANDLEWOOD, MARTY MORAN, AND HOULIHAN LOKEY)**

208.    The Trustee incorporates by reference the allegations contained in paragraphs 1

through 207 as if fully rewritten in this paragraph.

209.    The above-named Defendants aided and abetted the breaches of fiduciary duty

described in Count Eight above committed by other of the above-named Defendants resulting in

damage to Antioch.

210.    The above-named Defendants knew that actions taken by other of the above-

named Defendants constituted breaches of fiduciary duties.

211.    The above-named Defendants assisted with or encouraged those breaches of

fiduciary duties.

212.    As a result, above-named Defendants, jointly and severally, caused Antioch to

suffer damages.

## COUNT TEN – BREACH OF FIDUCIARY DUTY WITH RESPECT TO
## THE SALE PROCESS (DEFENDANTS LEE, ASHA, AND MORRIS)

213.    The Trustee incorporates by reference the allegations contained in paragraphs 1

through 212 as if fully rewritten in this paragraph.

214.    The above-named Defendants owed common law and statutory fiduciary duties to

Antioch and its creditors of good faith, loyalty, and disclosure, to refrain from self-dealing and

other conflicts of interest, and to avoid wasting and mismanaging corporate assets.    .

215.    The above-named Defendants rejected the Whitney proposal and caused Whitney

to withdraw as a potential purchaser which was not in the best interest of Antioch or its creditors.

216.    The above-named Defendants allowed the Morgan family to pursue their own

interests to the detriment of Antioch.

217.    The above-named Defendants continued to employ multiple professionals

providing duplicative services that were unlikely to be successful and were not successful which

amounted to a waste of Antioch's assets.

218.    As a result, the above-named Defendants, jointly and severally, breached their

fiduciary duties to Antioch and Antioch's creditors, causing Antioch to suffer damages.

## COUNT ELEVEN – AIDING AND ABETTING BREACH OF FIDUCIARY
## DUTY WITH RESPECT TO THE SALE PROCESS (DEFENDANTS
## LEE, ASHA, MORRIS, EVOLVE, AND LIPSON-WILSON)

219.    The Trustee incorporates by reference the allegations contained in paragraphs 1

through 218 as if fully rewritten in this paragraph.

220.    The above-named Defendants aided and abetted the breaches of fiduciary duty

described in Count Ten above committed by other of the above-named Defendants, resulting in

damage to Antioch.

221.    The above-named Defendants knew that actions taken by other of the above-named Defendants constituted breaches of fiduciary duties.

222.    The above-named Defendants assisted with or encouraged those breaches of fiduciary duties.

223.    As a result, the above-named Defendants, jointly and severally, caused Antioch to suffer damages.

## COUNT TWELVE – TORTIOUS INTERFERENCE WITH BUSINESS CONTRACTS WITH RESPECT TO THE SALE PROCESS (DEFENDANTS LEE, MARTY MORAN, AND CANDLEWOOD)

224.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 223 as if fully rewritten in this paragraph.

225.    Antioch entered into a contract with Houlihan Lokey in 2007 to explore a sale or restructuring of the Company.

226.    Defendants Lee, Marty Moran, and Candlewood knew or reasonably should have known of Antioch's contract with Houlihan Lokey.

227.    Defendants Lee's and Marty Moran's conduct in engaging Candlewood, and Lee's, Marty Moran's, and Candlewood's conduct in disrupting Houlihan Lokey's efforts to identify a purchaser for Antioch interfered with that contract.

228.    Defendants Lee, Marty Moran, and Candlewood knew or reasonably should have known that their conduct interfered with that contract, causing Antioch to suffer damages.

229.    Defendants Lee, Marty Moran, and Candlewood acted with ill will.

230.    Defendants Lee, Marty Moran, and Candlewood acted with a conscious disregard for the rights of others and with knowledge that their conduct would cause substantial harm.

231.    Defendants Lee, Marty Moran, and Candlewood were not justified in their conduct.

232.    As a result, Defendants Lee, Marty Moran, and Candlewood caused Antioch to suffer damages.

## COUNT THIRTEEN – EQUITABLE SUBORDINATION
### (ATTIKEN, LEE, ASHA, THE MORGAN TRUSTS)

233.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 232 as if fully rewritten in this paragraph.

234.    Defendants Attiken, Lee, Asha and the Morgan Trusts (the "Equitable Subordination Defendants") are "insiders" pursuant to 11 U.S.C. § 101(31).

235.    The Equitable Subordination Defendants engaged in inequitable conduct, including, but not limited to, self-dealing, breaches of fiduciary duties, and depletion of corporate assets.

236.    The Equitable Subordination Defendants' conduct in this regard is egregious, substantial and gross misconduct.

237.    The Equitable Subordination Defendants' conduct caused injury to the Debtors' creditors.

238.    The Equitable Subordination Defendants' conduct conferred an unfair advantage on the Equitable Subordination Defendants.

239.    Attiken has made a claim for monies owed in this case in the amount of not less than $169,547.63.

240.    Lee has made a claim for monies owed in this case in the amount of not less than $5,276,190.77.

241.    The Morgan Trusts have made claims for monies owed in this case in a total amount of not less than $47,968,019.01.

242.   Asha has made a claim for monies owed in this case in the amount of not less than $464,728.43.

243.   The Equitable Subordination Defendants' claims must be equitably subordinated to all other creditors in this case to return the Debtors' creditors to their rightful positions.

244.   Under these circumstances, equitable subordination of the Equitable Subordination Defendants' claims is not inconsistent with, and is in furtherance of, the provisions of the Bankruptcy Code.

### COUNT FOURTEEN – PREFERENTIAL TRANSFERS (DEFENDANTS ATTIKEN, BEVELHYMER, BLAIR, CRG, FELIX, LEVIMO, LUCE, MCLAUGHLIN, MORRIS, NORTHRUP, SANAN, VON MATTHIESSEN, WALKER, LIPSON WILSON, LEE AND ASHA)

245.   The Trustee incorporates by reference the allegations contained in paragraphs 1 through 244 as if fully rewritten in this paragraph.

246.   Defendants Attiken, Bevelhymer, Blair, CRG, Felix, Levimo, Luce, McLaughlin, Morris, Northrup, Sanan, von Matthiessen, Walker, Lipson-Wilson, Lee and Asha (the "Preference Defendants") are "insiders" of the Debtors pursuant to 11 U.S.C. § 101(31).

247.   During the one-year period prior to the Petition Date (the "Preference Period"), the Debtors transferred the aggregate sum of  $6,145,935.71 to the Preference Defendants, for payment of preexisting obligations (the "Preferential Transfers").  The Preferential Transfers are described more particularly on Exhibit A to this Complaint, which is incorporated by reference.

248.   Funds for the Preferential Transfers constitute an interest of the Debtors in property.  The Preferential Transfers diminished the value of the Debtors' estates by the amount of the Preferential Transfers.

249.   Upon information and belief, the Preferential Transfers were made by the Debtors to or for the benefit of the Preference Defendants as creditors of the Debtors, for or on account of

antecedent debt for goods, services, and/or the lease of real or personal property owed by the Debtors before the Preferential Transfers were made.

250.    The Debtors were insolvent at the time of the Preferential Transfers.

251.    The Preferential Transfers by the Debtors to the Preference Defendants, which were made for the benefit of the Preference Defendants, enabled the Preference Defendants to receive more than the Preference Defendants would have received on account of the antecedent debt if this case were a case under Chapter 7 of the Bankruptcy Code, the Preferential Transfers were not made, and the Preference Defendants received payment of such debt to the extent provided for by the provisions of the Bankruptcy Code.

252.    The Trustee may avoid the Preferential Transfers made to the Preference Defendants pursuant to Section 550 of the Bankruptcy Code.

253.    Accordingly, the Trustee is entitled to judgment against the Preference Defendants avoiding the Preferential Transfer and recovering the value of the Preferential Transfer plus pre-judgment interest, post-judgment interest, costs, and attorney fees.

254.    The Preference Defendants are transferees as that term is defined in Section 550(a) of the Bankruptcy Code.

255.    Pursuant to Section 550 of the Bankruptcy Code, the Trustee, on behalf of the Debtors, is entitled to recover the Preferential Transfers avoided under Section 547 of the Bankruptcy Code.

256.    Any transfer avoided by this Court pursuant to Section 547 of the Bankruptcy Code is preserved for the benefit of the Debtors' estates with respect to property of the Debtors' bankruptcy estates, pursuant to Section 551 of the Bankruptcy Code.

257.    Accordingly, the Trustee, on behalf of the Debtors, is entitled to judgment against the Preference Defendants awarding the Preferential Transfers or their value to the Debtors' estates and preserving such value for the Trust, on behalf of the Debtors, for the benefit of the Debtors' estate, plus pre-judgment interest, post-judgment interest, costs and attorney fees.

258.    The Preference Defendants have or may claim to have a claim or claims against the Debtors' estates.

259.    The Trustee, on behalf of the Debtors, objects to any and all claims of the Preference Defendants, including without limitation, all pre-petition and post-petition claims, pursuant to Section 502(d) of the Bankruptcy Code.

260.    The Trustee, on behalf of the Debtors, is entitled to judgment against Preference Defendants disallowing all claims of the Preference Defendants unless and until the Preference Defendants return all amounts due to the estate in this case as provided by Section 502(d) of the Bankruptcy Code and any other separately filed objections to such claims are resolved.

261.    The Trustee, on behalf of the Debtors, is entitled to judgment against the Preference Defendants in the amount of the Preferential Transfers, together with interest at the average of the Federal Reserve Board prime rate from the date of the Complaint until entry of judgment in this Adversary Proceeding, and thereafter at the rate provided under 28 U.S.C. § 1961(a) from the date of entry of judgment until paid, plus costs and attorney fees.

## COUNT FIFTEEN – ATTORNEY FEES

262.    The Trustee incorporates by reference the allegations contained in paragraphs 1 through 261 as if fully rewritten in this paragraph.

11585190.1                                              49

263.    Under applicable state and federal law, the Defendants are liable to the Trustee for his fees and costs in prosecuting the claims described in Counts One through Fourteen of this Complaint.

**WHEREFORE**, the Trustee respectfully demands judgment as follows:

(A)  against Defendants Lee, Asha, Carlson, McLaughlin, Sanan, von Matthiessen, Blair, and Attiken, jointly and severally, for compensatory damages arising from breaches of fiduciary duty related to the ESOP transaction in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(B)  against Defendants Lee, Asha, Carlson, McLaughlin, Sanan, von Matthiessen, Blair, Attiken, GreatBanc, and Houlihan Lokey, jointly and severally, for compensatory damages arising from aiding and abetting breaches of fiduciary duty related to the ESOP transaction in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(C) against Defendants Asha, CRG, Epstein, Ravaris, Lipson-Wilson, Felix, Hoskins, and Bevelhymer, jointly and severally, for compensatory damages arising from breaches of fiduciary duty related to Condor in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(D) against Defendant Reliance for compensatory damages arising from its professional negligence in an amount in excess of $75,000, exclusive of interest and costs, to be proven at

trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(E)   against Defendant Evolve for compensatory damages arising from its professional negligence in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(F)  against Defendants Lee, Asha, Blair, McLaughlin, Luce, von Matthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, and Attiken for compensatory damages arising from breaches of fiduciary duty with respect to the Levimo transaction in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(G)  against Defendants Lee, Asha, Blair, McLaughlin, Luce, von Matthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken, and Marty Moran for compensatory damages arising from aiding and abetting breaches of fiduciary duty with respect to the Levimo transaction in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(H)  against Defendants Lee, Asha, Blair, McLaughlin, Luce, von Matthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken, Northrup, CRG, Ravaris, Epstein, and Walker for compensatory damages arising from breaches of fiduciary duty with respect to the sale process in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(I) against Defendants Lee, Asha, Blair, McLaughlin, Luce, von Matthiessen, Sanan, Lipson-Wilson, Felix, Bevelhymer, Attiken, Northrup, CRG, Ravaris, Epstein, Walker, Candlewood, Marty Moran, and Houlihan Lokey for compensatory damages arising from aiding and abetting breaches of fiduciary duty with respect to the sale process in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(J) against Defendants Lee, Asha, and Morris for compensatory damages arising from breaches of fiduciary duty with respect to the sale process in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(K) against Defendants Lee, Asha, Morris, Evolve, and Lipson-Wilson for compensatory damages arising from aiding and abetting breaches of fiduciary duty with respect to the sale process in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(L) against Defendants Lee, Marty Moran, and Candlewood for compensatory and punitive damages arising from tortious interference with a business contract in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial, disgorgement and restitution in amounts in excess of $75,000 to be proven at trial, plus reasonable costs and attorney fees;

(M) against Defendants Attiken, Lee, Asha, and the Morgan Trusts equitably subordinating their claims to all other creditors in these Chapter 11 cases and to award any relief allowed by Section 510 of the Bankruptcy Code;

(N)  against Defendants Attiken, Bevelhymer, Blair, CRG, Felix, Levimo, Luce,

McLaughlin, Morris, Northrup, Sanan, von Matthiessen, Walker, Lipson-Wilson, Lee and Asha

determining that the Preferential Transfers are avoidable and that the Trust, on behalf of the

Debtors may recover the full amounts of the Preferential Transfers from the Preference

Defendants under Sections 547 and 550 of the Bankruptcy Code, preserving the Preferential

Transfers for the benefit of the Debtors' Chapter 11 bankruptcy estates,  granting to the Trust an

award of pre-judgment interest, costs and attorney fees, together with interest on the judgment at

the federal judgment rate and disallowing all claims of the Preference Defendants;

(O)  granting to the Trustee such other relief as is just.

Dated: December 23, 2009                    Respectfully submitted,

                                            /s/ Marcia Voorhis Andrew
                                            Marcia Voorhis Andrew (0040289)
                                            Aaron M. Herzig (0079371)
                                            Beth A. Silvers (0081236)
                                            Christina L. Fischer (0083312)
                                            Taft Stettinius & Hollister LLP
                                            425 Walnut Street, Suite 1800
                                            Cincinnati, OH 45202-3957
                                            (513) 381-2838 Phone
                                            (513) 381-0205 Fax
                                            andrew@taftlaw.com
                                            herzig@taftlaw.com
                                            silvers@taftlaw.com
                                            cfischer@taftlaw.com

                                            Counsel for W. Timothy Miller, Trustee of
                                            The Antioch Company Litigation Trust

## JURY DEMAND

Plaintiff W. Timothy Miller, Trustee of The Antioch Company Litigation Trust, hereby

demands a trial by jury on all issues.

                                            /s/ Marcia Voorhis Andrew

**EXHIBIT A**

**PREFERENTIAL TRANSFERS**

| Defendant | Amount Transferred |
|---|---|
| Chandra Attiken | $102,707.86 |
| Steve Bevelhymer | $191,027.85 |
| Nancy Blair | $56,936.09 |
| CRG Partners Group, LLC | $2,064,557.46 |
| Karen Felix | $268,471.76 |
| Levimo, LLC | $2,605,318.03 |
| Wayne Alan Luce | $47,374.85 |
| Jeanine McLaughlin | $34,029.78 |
| Lee Morgan | $180,862.79 |
| Asha Morgan Moran | $140,496.05 |
| G. Robert Morris | $25,002.00 |
| James Northrup | $45,059.83 |
| Denis Sanan | $33,054.13 |
| Malte von Matthiessen | $42,885.13 |
| Frederick Walker | $107,056.53 |
| Kim Lipson-Wilson | $201,095.57 |
| Total | $6,145,935.71 |